. Willing v. United States.

334; 5 vol. 126; 4 vol. 456; 3 vol. 88; 1 vol. 236; 4 vol. 446, § 112; Ibid. 427; 1 Hawk. 306; Bro. Abr. 203; 1 Hale 291, 525; 2 Ibid. 190. 2d. That the perjury charged was indictable, according to the second count of the indictment, independent of the bankrupt law, upon the general penal act (1 vol. 108), inasmuch as the provisions of the bankrupt law, do not create the offence ; are affirmative and not repugnant : and, with respect to the punishment, are cumulative. Cowp. 297; 2 Hale 705; 4 Burr. 2026; 23 Geo. II., c. 13; *Leach 253; 1 Hawk. 306, B. 1, c. 40, § 5; Leach, 715; 2 Hale [*374 191–2. And 3d. That according to the opinions of some of the judges of the supreme court,(a) the perjury charged, was indictable at common law ; and in that case, the conclusion of the indictment, "against the form of the statute," was to be regarded as surplusage. 2 Hawk. 83; *United States* v. *Ravara*, 2 Dall. 297; *Williams' case*, 2 Cranch 82, in note ; *United States* v. *Worrell*, 2 Dall. 384.

---

WILLING *et al.*, Plaintiffs in error, *v.* UNITED STATES. (*b*)

*Shipping.—Registry.—American character.*

The sale of part of a vessel, by parol, whilst at sea, to an American citizen, and a resale to the vendor, on her arrival in port, and before entry, does not forfeit her American character, nor render her subject to foreign duties ; a new register is not necessary.

ERROR from the District Court of Pennsylvania. Upon the record, it appeared, that this was an action upon a bond, dated the 16th of November 1802, given by Willings & Francis and J. Miller, in the penal sum of $15,442, to secure the payment of $7720.41, being the amount of one-half of the duties payable on the cargo of the ship Missouri, on the 16th of May 1803. The defendants pleaded, 1st. That the duties on the goods in question amounted only to $14,036.73, on account of one-half of which ($7018.36) the bond was given. And 2d. Payment.

The plaintiff replied, 1st. That the ship was an American registered vessel, owned by the defendants, when she sailed from Philadelphia for Canton, on the 1st of December 1800 ; that after her departure, she was in part sold to Jacob G. Koch and others, on the 12th of February 1801 ; that on making the sale, the ship was not registered anew, nor was there any bill of sale executed, reciting her register ; that the goods were imported into the port of Philadelphia, subsequent to the sale, on the 16th of Nov-

---

(a) The attorney of the district stated that the last point was made, in deference to the opinion of the court, on the question of a common-law federal jurisdiction, in criminal cases ; and not as expressive of his own sentiments upon the subject.

(b) s. c. 1 W. C. C. 125, which is a better report of the opinion of WASHINGTON, J.

ember 1802 ; that the amount of the duties was $15,440.82, for one-half of which, payable in six months, the bond was given.    2d. *Non solverunt.*

The defendants rejoined, that they admit the sale to Koch and others, *375] and the importation of the goods after such sale ; but they *aver that the ship was at sea, at the time of the sale, having her register on board, and that it was not, therefore, in the power of the defendants to deliver it up, at the time of the sale ; that on her arrival, the 15th of November, the defendants did execute a bill of sale to Koch and others, reciting the register, and the master delivered up the register to the collector, whereupon, the ship was registered anew, as the joint property of the defendant and Koch and others ; that on the 7th of January 1803, Koch and others resold to the defendants, and executed a bill of sale reciting the register last mentioned ; and that, thereupon, the ship was registered anew as the property of the defendants, whereby she continued an American registered vessel, not liable to foreign duties, and that the domestic duties only amounted to $14,036.73, &c.

The plaintiffs sur-rejoined, that they admit, the ship was at sea, when she was in part sold to Koch and others; but aver, that she was not registered anew, nor was there a bill of sale, reciting the register, at the time of the sale, nor at the time of her arrival. That they also admit that the master delivered to the collector the register of the ship, at the time of his arrival; but they insist that it was long after she had been in part sold, without being registered anew, &c.; that the registry of the ship, on the 22d of December 1802, in the name of Koch and others and the defendants, was made after the resale by Koch and others to the defendants, when Koch and others had ceased to own any part ; and that they admit, that Koch and others, having previously resold, did, on the 24th of January 1803, deliver up the register in their names, and the ship was then registered anew, as the exclusive property of the defendants.    But they insist, that at the time of the actual resale by Koch and others (15th November 1801), she was not registered anew, nor did they then execute a bill of sale, reciting the register; that the registry of the 24th of January 1803, was made under color of a bill of sale executed by Koch and others to the defendants, long after the resale, and they had ceased to have any interest in the ship ; and that at the time of the sale in part to Koch and others, of the resale by them to the defendants, of the arrival of the ship in the port of Philadelphia, and of her entry, she had ceased to be deemed a ship of the United States.    The defendants demurred, generally, to the sur-rejoinder ; and the plaintiffs joined in demurrer.

The general question, upon the demurrer, was, whether a registered vessel of the United States, being sold in part, to resident citizens of the United States, while she was at sea, without a bill of sale, reciting the register, and without being then registered anew, was liable, with her cargo, to the payment of foreign, or only to the payment of domestic, tonnage and duties, on her return to a port of the United States ?    And the argument *376] rested chiefly upon the terms and meaning of *the 14th section of the registering act, which is in these words :

"And be it further enacted, that when any ship or vessel, which shall have been registered pursuant to this act, or the act hereby in part repealed, shall, in whole, or in part, be sold or transferred to a citizen or citizens of

Willing v. United States.

the United States , or shall be altered in form or burden by being length-
ened or built upon, or from one denomination to another, by the mode or
method of rigging or fitting, in every such case, the said ship or vessel
shall be registered anew, by her former name, according to the directions
herein-before contained (otherwise she shall cease to be deemed a ship or
vessel of the United States), and her former certificate of registry shall be
delivered up to the collector to whom application for such new registry
shall ,be made, at the time that the same shall be made, to be by him
transmitted to the register of the treasury, who shall cause the same to be
cancelled.   And in every such case of sale or transfer, there shall be some
instrument of writing, in the nature of a bill of sale, which shall recite at
length the said certificate, otherwise the said ship or vessel shall be incapa-
ble of being so registered anew ; and in every case in which a ship or vessel
is hereby required to be registered anew, if she shall not be so registered
anew, she shall not be entitled to any of the privileges or benefits of a ship
or vessel of the United States.   And further, if her said former certificate
of registry shall not be delivered up, as aforesaid, except where the same
may have been destroyed, lost, or unintentionally mislaid, and an oath or
affirmation thereof shall have been made as aforesaid, the owner or owners
of such ship or vessel shall forfeit and pay the sum of five hundred dollars,
to be recovered with costs of suit."   In the district court, judgment was ren-
dered for the United States. (a)

---

(a) Before the decision of the district court, on the principal question, a preliminary
point of some importance was determined.   By the 65th section of the impost law
(4 vol. 386–7), it is provided, that "where suit shall be instituted on any bond for the
recovery of duties due to the United States, it shall be the duty of the court where
the same shall be pending, to grant judgment at the return term, upon motion, unless the
defendant shall, in open court, the United States attorney being present, make oath or
affirmation, that an error has been committed in the liquidation of the duties demanded
upon such bond, specifying the errors alleged to have been committed, and that the
same have been notified in writing to the collector of the district, prior to the com-
mencement of the return-term aforesaid.   Whereupon, if the court be satisfied, that a
continuance until the next succeeding term is necessary for the attainment of justice,
and not otherwise, a continuance may be granted, until next succeeding term and no
longer."

In order to obtain a continuance of the cause, at the return-term, the defendants
filed the following affidavit : "Thomas W. Francis, one of the above defendants, being
duly sworn, deposeth, that an error has been committed in the liquidation of the duties
demanded on the above bond, for which this suit is brought, inasmuch as the sum of
$7720.41 is thereby demanded for duties on goods, per the ship Missouri, whereas, the
sum of $7018.73 only was due for the same, the said ship, the Missouri, being a regis-
tered ship, belonging to citizens of the United States, and not a foreign or unregistered
ship, or liable to foreign duties.   And the said Thomas W. Francis further deposes,
that the above errors have been notified in writing to the collector of the district of
Phil:delphia, before the commencement of this present term, being the return-term to
which the above action was brought, and that this deponent did, in behalf of himself
and the other obligors in the said bond, on the 16th day of May last, tender to the cash-
ier of the bank of the United States, where the said bond was deposited for collection,
the last-mentioned sum of money ($7018.73) being, as this deponent verily believes, the
whole amount thereon due : that the said cashier of the bank refusing to receive the same,
this deponent, in behalf of the aforesaid, tendered the same sum of money to the collec-
tor of the district of Philadelphia, on the 17th day of the same month, being as soon

*The cause was again argued in the circuit court, on the 6th and 7th of May 1804, by *Dallas* (district-attorney), for the United States, and by *Rawle* and *Lewis*, for the plaintiffs in error.

*378]      *For the United States.*—The general question is, whether the

---

as he could ascertain by inquiry that the said bond had been returned from the bank of the United States to the collector. That the said collector also refused to receive the same ; that this deponent afterwards, to wit, on the 7th of July last, did pay to the attorney of the district of Pennsylvania the said sum of $7018.73, say, seven thousand and eighteen dollars and seventy-three cents, on the terms and conditions expressed in a receipt, whereof a copy is hereunto annexed."

*Dallas* (the district-attorney) insisted, that the cause assigned for a postponement of trial, in the affidavit, was not an error in the liquidation of the duties; for the manifest policy and intent of the law, where to enforce a payment of the revenue, against every plea or pretext, except a plain error in fact ; and here, no error in the calculation of figures, no accidental error in the rate of duties, was assigned ; but a defence was suggested, upon a principle, which would equally apply to a charge of foreign duties, made in consequence of any other description of forfeiture and disability, under the acts of congress ; though the secretary of the treasury was vested with a special power of remission and mitigation in such cases.

After argument, however (*Rawle* and *Lewis* being for the defendants), the district judge decided, that the cause assigned for a postponement, was within the terms and meaning of the act of congress.

The opinion of the court, on the principal question, was afterwards delivered in the following terms:

PETERS, District Judge.—This is a suit commenced on a custom-house bond, for one-half the duties due to the United States, by the defendants, Willings & Francis, on goods imported in the ship Missouri, from Canton. The bond is in the usual form, dated the 15th of November 1802; and was given with other bonds for duties, as charged at the custom-house, amounting to $15,440.82 ; being the sum chargeable on goods imported in a ship belonging to a foreigner. For the facts, I refer to the pleadings on file. The real point in dispute is, " Whether the goods imported in the ship Missouri are liable to foreign or domestic duties ?" There is no doubt, and by the joinder in demurrer it is allowed, that the ship, when the goods were laden, and ever since, did belong to citizens of the United States. And if they had been the same citizens to whom the ship belonged at the time of her clearing out at the American custom-house, before her departure for Canton, only the domestic duties could have been charged. These would have amounted to $14,036.73, causing a difference in favor of the defendants, Willings & Francis, of $1404.09. This sum only is in dispute, at this time, though, it is said, the defendants are affected by the point in controversy, to a considerable amount. But the difficulty is created by a transfer having been made by Willings & Francis, the original owners, to Jacob Gerard Koch and others, also citizens of the United States, of a part of the ship Missouri, while at sea and on her voyage. No bill of sale, reciting the register of the ship, was made, until after her arrival at the port of Philadelphia. A parol sale was made which, though legal, *bonâ fide* and effectual, as between the parties, was not so conformable to the law of the United States, as to entitle the vendees to have their names inserted in a new register. Finally (after the sale by parol before mentioned and a resale to the original owners), a bill of sale was given agreeable to law, and the vessel obtained a new register, though the duties remained as at first charged at the custom-house. T. W. Francis, at the time of the entry, disclosed all the circumstances, and the whole proceedings are *bonâ fide* and without fraud, or any improper intention. The amount having been liquidated at the custom-house as for foreign duties, and the bond before mentioned, among others, given for their amount, a suit was commenced in this court thereon. At the return of the writ, the attorney of

Willing v. United States.

cargo of the ship Missouri was liable to the payment of foreign duties, on the 15th of November 1802, when she returned to the *port of Philadelphia. It will be attempted to maintain the affirmative on two grounds : 1st. That she had not a register in force. 2d. That she was not then entitled to be registered anew. [*379

---

the district moved for judgment agreeable to the act of congress. The defendants filed an affidavit in legal form, requesting a trial or a continuance, because they alleged there had been an error in the liquidation of the account at the custom-house, owing to for-eign, instead of domestic, duties having been charged. On mature consideration, and after diligent and careful examination into the technical meaning of the word " liquida-tion," as explained by the best authorities, both legal and philological, I was of opinion, that the court was bound to comply with the defendant's request. The authority of the court to give an opportunity for legal investigation, is grounded on the true meaning of this word liquidation, which comprehends the principles, as well as arrangements of accounts.

The case has been ably argued on both sides. The whole controversy turns on the 14th section of the act entitled " an act concerning the registering and recording of ships and vessels," passed the 31st of December 1792. A very extensive range has been taken by the counsel on both sides of the question. The principles, intent and policy of the act have been investigated with much ability and talent. I do not hesitate to say, that to me this question, on the words of the section, is difficult, though one of the counsel for the defendants seems to consider the case as perfectly clear. I do not give an opinion upon it, with confidence, though my duty requires it, and I must decide. Were I in a situation to say what the law ought, in this case, to have been, I should have a clear conviction, and would, accordingly, decide in favor of the defendants. I should be warranted in this opinion, by the law as it now is. The knotty part of the question, is that affected by the time when, in the 14th section. " When any ship or vessel, which shall have been registered pursuant to this act, or the act hereby in part repealed, shall, in whole or in part, be sold or transferred to a citizen or citizens of the United States, or shall be altered in form, &c."

On the part of the defendants, it is insisted, that the word when means any time after the arrival of the vessel, at the port where a new register can be legally obtained And according to Lord COKE's opinion, when one is bound to do an act, but no time fixed, the party has his whole lifetime allowed to perform it. Authorities were pro-duced to show, that in the construction of even penal statutes, the spirit, and intent and policy of the law might be called in aid, where words are doubtful: that it is impossi-ble to procure the new register, until the certificate of registry is delivered up : that this cannot be done, before her return from her voyage ; and until it is done, provided it be accomplished before her proceeding on another voyage, she is still to be considered as holding her original character ; and therefore, not subject to the disabilities attached to a foreign ship. That if it were otherwise, the law would be oppressive on our own citizens, although its policy is grounded in a system to serve them, while it prohibited foreign ships from trading, on terms so beneficial as those of our own nation. That if the word "when" could not be satisfied, but by a new register, procured at the time of the sale, it would amount to an unjust and burdensome exclusion of all sales to citizens, of our vessels, in whole or in part, while at sea or on their voyages; to the great injury of our commerce, and ruinous embarrassment of our merchants, whose necessities or plans required transfers of their vessels, either to relieve them from pressures, or enable them to form new speculations. That such a rigorous construction might be justifiable, when ships in port were sold or transferred, because their certificates of registry were attainable. But as the law does not compel parties to impossibilities (lex non cogit ad impossibilia), it is otherwise, when ships are at sea. It satisfies the law, if the new register is applied for, when the temporary impracticability is removed. True it is, that foreigners can never obtain new registers, under transfers or sales from American citizens. All the precautionary measures of the law are aimed at them. The oath at

327

Willing v. United States.

*1st. The discussion does not turn upon the fact of American ownership, but upon the legal existence, of an American register.
*381]    *The object of the law was to secure to American citizens, the exclusive benefit of American tounage and navigation. The means employed were directed, to ascertain, first, the fact that the vessel was American built; and secondly, to trace every change of ownership, in whole, or in part.

And the means being suited to the object, all theories, all arguments *ab inconvenienti*, must yield to the positive terms of the law, in this instance,

the time of entry must disclose the owners; or foreign character will be presumed. This shows that if the oath is taken, and no foreign ownership appears, it is all the law requires to establish the American character. But the character of the vessel sold by one American citizen to another, was not even suspended, by the clause under consideration, until after her departure from the port whereat she could have obtained a new register, on her arrival from her voyage, during which the sale or transfer was made. It is, therefore, concluded that domestic, and not foreign, duties should have been charged on the goods imported in the ship in question. And that as to the law of the 3d March 1803, it neither has or should have any influence on a precedent transaction: it only fixes the time when a new register must be applied for, which was before uncertain: it also gives power to the secretary of the treasury to remit penalties and forfeitures and remove disabilities, in past as well as future cases.

On behalf of the United States, it was contended, that as no time was fixed in the law for renewing the register, it must be done *instanter*. Where a disability is the consequence, it cannot be removed, until the renewal is completed. If it cannot be done at the moment, owing to impediments not then to be overcome, the party laboring under them must suffer temporary inconveniences, which it was in his power to foresee. In England, where the character of the ship is not altered, an arrangement was made of sending information of the transfer immediately to the custom-house. According to British authorities, though they relate only to the validity of the transfer as between the parties, it is said, 2 East 404, that "if the act of parliament (dictating this measure) were to be considered as giving an indefinite time (or even a reasonable time, after the execution) for the compliance with its requisites; it would enable a transfer of property to be made to foreigners, who might remain concealed owners, until the return of the vessel to her port, which might not be for a great length of time." No time being fixed in the 14th section, it must be *instanter*. A number of extracts from the laws of the United States were produced, to show, that all these laws required the strictest attention to their injunctions, under the severest penalties and forfeitures. That it is not denied that one citizen may sell and transfer to another a ship at sea: but if it is done, the sale is subject to inconveniences on which the parties ought to calculate or take the consequences. The law is or ought to be known to everybody. Those who are shippers of goods should make themselves masters of the subject, both as it relates to sales to citizens and to foreigners, or suffer any inconveniences arising from want of caution. It was asserted, that the fiscal officers had uniformly construed the law. as it is now contended for. The congress passing this law meant to exclude sales at sea, to prevent the use of our vessels covertly by foreigners. The register of the Missouri was vacated on the 12th February 1801: she was from that time subject to the disabilities of a foreign ship, until her character was revived: and that could not be done until after the 21st December 1802, when the legal bill of sale was made. No subsequent transaction can, by relation, operate on the duties chargeable, though the character of the ship may be restored. If the foreign character of the vessel existed at the time of the liquidation, no *ex post facto* proceedings can alter the then existing circumstances. There is no distinction in the law between a sale in port, or one at sea: an immediate application for a new register is required in both cases. If it cannot be had, on a sale at sea, it shows

Willing v. United States.

as in numerous other instances of forfeiture under the navigation and revenue laws. In order to ascertain the changes or transfers of property, considerations respecting the transfer to an alien, whether the vessel was in port or at sea, on the one hand; and on the other hand, respecting the transfer to a citizen, whether the vessel was in port or at sea, naturally occurred. Now, no American vessel, wherever she may be, if sold to an alien, can be registered anew. In England, a bill of sale to an alien is void, without the consent of three-fourths of the owners, indorsed upon the certificate. In America, there is no such provision; but still, upon a clandestine sale of a part-owner

---

the law meant to exclude the vessel for the time from her American character: *eo instanti*, that the property is changed, her character ceases or is suspended according as she is sold to a foreigner or a citizen. A number of British cases were produced; and said to be analogous, though in that country, they related to change of property. In this, the principles apply to change of character. 3 T. R. 406; 3 Bro. Ch. 571; 5 T. R. 710; 2 East 399, 404; 1 Bos. & Pul. 483; Parker 215. There is no distinction in the laws of the United States, as they relate to a sale either to a citizen or a foreigner, in the point of time, in which the American character ceases to operate: in both cases, the cessation is at the moment of sale. The citizen may revive it, but the foreigner never can.

The law of March 1803, was produced to show a legislative construction. And the custom of the fiscal officers was said to be a contemporaneous and continued interpretation. Although I may not have done justice to the arguments of the counsel on either side, I have thought it proper to recite them in a summary way, to show the conflict of opinion, on the subject.

For myself, I declare, that, although the interpretation given on the part of the United States, is not consistent with my ideas of what the law should have been, I do not see that I am authorized judicially to pronounce that it was not, as on the part of the United States, it is contended to have been, at the time of the transaction, which is the subject of discussion. It appears to me, that the congress enacting the law of 1792, in their zeal to exclude foreigners, did not see, or chose to think lightly of, the inconveniences to which, in such cases as the one now before me, they subjected our own citizens. It also seems to me, a case omitted, either accidentally or with design. The legislature alone were competent to remedy the defect: and they have done this, in cases occurring after their act of March 1803. In the department in which I am placed, I am not competent to give relief; or by interpretations of supposed spirit and intention, supply omissions, or add to the provisions of the then existing law. In cases attended with such unmerited penalties, it is consolatory, that the laws of our country have not left the parties without protection. The congress of 1803, sensible of the hardships consequent on a rigid construction of the former law, have specially and clearly authorized the secretary of the treasury to remit "any foreign duties, which shall have been incurred," by reason of disabilities, happening under the former laws, recited in the act of March 1803. There is no doubt in my mind, that this (the foreign duties having been incurred under the former laws, by a temporary disability and incapacity to obtain a new register) is a case proper for the deliberation of the officer vested with the power of mitigating or dispensing with the severity of fiscal laws. He may (if he so inclines, under the circumstances stated to him) give the relief which the austerity of judicial duty disables a court from affording. Although this is my view of the subject, I think it a hard case, and that it ought not to rest on my opinion. I shall deem myself bound to give every facility to an appeal. If other cases, depending on the same point, occur, I shall, on payment of the undisputed part of the demand, suspend judgment (or grant it on terms) for the contested sums, until the opinion of a superior court can be had; if the parties affected shall choose to take that course.

Let judgment be entered for the sum now due to the United-States. I understand, that the domestic duties in part of the bond have been paid.

the innocent owners are protected to the amount of their interest in the vessel. 4 vol. Acts Cong. 11; Abbot, 45; 13 Geo. III., c. 26; 2 vol. Acts Cong. p. 131, § 16, 17, 7; Abbot, 30; 26 Geo. III., c. 60, § 15. Again, an American vessel, if sold even to a citizen, must, upon every sale, in whole or in part, be registered anew ; the old register must be surrendered ; the bill of sale must be in writing, containing a recital of the register ; and on every entry at a port of the United States, the mesne transfers must be disclosed. 2 vol. p. 131, § 14, 17. In England, a distinct provision is made for cases, in which vessels are sold, when in port ; and for cases, in which they are sold, while at sea. For the former, it is required, that an indorsement shall be made on the register ; or that the vessel be registered anew, at the option of the remaining owners, without which the sale is void. (7 & 8 *Wm. III.*, c. 22, § 21; 34 *Geo. III.*, c. 68, § 15, 21.) And for the latter, it is required, in order to render the sale valid, that the bill of sale shall recite the register ; that a copy of the bill of sale be delivered to the commissioners ; that notice of the transfer be given at the ship's port; and that the indorsement be made on the register, when the ship returns. (Ibid.) But in America, the only provision in the case of a sale of a vessel at sea is contained in the 14th section of the law (2 vol. p. 131); while the sale of a vessel in port is anxiously guarded, as well by that section, as by the 14th, 11th and 12th sections. The registering bond does not embrace the case of a sale, while the vessel is at sea ; the 17th section only requires a disclosure of the fact, without declaring any consequence ; and in short, it is only in the 14th section, that any provision is made for a formal bill of sale, for a surrender of the old register, or for the taking out of a new one. And yet, the policy which prescribes such guards against unlawful transfers, while a vessel is in port, operates *382] more forcibly in the *cases of a transfer, while a vessel is at sea. The legislative jealousy of sales abroad, is manifested, indeed, by the provision, which disqualifies citizens, resident in foreign countries (with a few exceptions) from being holders of American registered vessels. (2 vol. 132, § 2, 134, § 4.) Then, if the policy of the law is general, so are the words of the 14th section of the act, embracing every sale of a vessel, in whole or in part, at home or abroad ; and to preserve the American privileges of the vessel, the requisites of the section are, a new register on the sale, a surrender of the old register, and a bill of sale, reciting the register. On the sale of the Missouri, to Koch and his associates, her old register ceased to be in force. A new one might be obtained, provided, at the time of applying for it, the old one was surrendered, and a bill of sale, in due form, was produced : but after vacating the old register by a sale, the ship ceased to be privileged, until a new register was obtained. A formal bill of sale is a *sine qua non*, in every case ; and emphatically, it is necessary in the case of a sale, while a vessel is at sea, as the act of congress provides no other guard against an unlawful transfer. Besides, why should the 17th section merely require, upon the entry of a vessel from abroad, a disclosure of the fact, whether there has been any antecedent change of ownership, if it was not to bring the case within the provisions of the 14th section of the act? And if a vessel sold at home, is subject to the rigor of all the regulations of the 14th section, or what principle can a vessel sold abroad pretend to an exemption ? Is it not more within the policy, spirit and language of the law, to say, that the vessel sold abroad, shall, like the vessel sold at home, lose her privilege upon the

sale ; and as the danger of unlawful sales is greater abroad than at home, she shall remain unprivileged, until the actual renewal of her register? In illustration of the argument on this point, the following authorities were cited : 3 T. R. 406; 3 Bro. Ch. 571; s. c. 5 T. R. 710; 7 Ibid. 306; 2 East 399; 1 Bos. & Pul. 483.

2d. Nor was the Missouri even entitled to be registered anew, at the time of her return to the port of Philadelphia. There did not then exist a bill of sale, reciting the register ; and the recital might as easily be made from the record at the custom-house, as from the certificate of registry carried with the vessel.

The construction now contended for, has uniformly prevailed in the treasury department ; and contemporaneous construction ought to be regarded in deciding upon a doubtful law. (Park. 215.) Legislative construction is also in favor of the United States, for the very case of a vessel sold while at sea, has been specially introduced into the system (6 vol. 223, § 3); the power to remit the foreign duties incurred by such sale has been vested in the secretary of the treasury ; and legislative construction of a legislative act, where the words are doubtful, ought to be conclusive. (Parker 217.)

*For *Willings & Francis.*—In the present case, there is no sug- [*383 gestion of alien ownership, or *mala fides* of any kind. The meaning of the legislature should, therefore, be perfectly clear, before a decision inflicting, in effect, a heavy penalty, on the plaintiffs in error, is pronounced. The general policy of the law is, to give an advantage to the American citizen ; and if its language is at all obscure, he is entitled to the most beneficial interpretation. In this view of the controversy, the recapitulation of a few plain rules, will lead to a favorable result. 1st. A vessel can have but one register, at the same time. 2d. The certificate of the registry is delivered to the master of the vessel, when he leaves the port, and must be deposited at the custom-house upon his return. 3d. The register remains in force, until it has been legally vacated or cancelled. 4th. On a change of property, whether in whole or in part, a new register must be taken out ; but no new register can be granted, until the old one is surrendered. 5th. The execution of a bill of sale, reciting the register, will not authorize the granting of a new register, without such surrender of the old one ; but both must concur for that purpose.

In no part of the law, is a particular time prescribed, either for the execution of a bill of sale, or for the application for a new register. The 14th section amounts to nothing more than a declaration, that a vessel, which has been sold, in whole or in part, shall not enjoy the American privileges, until she is registered anew ; but the word " when " is not used as an adverb of time ; nor does the section require, that the vessel shall be registered anew, at the moment of the transfer. If, therefore, the bill of sale is executed, and the old register surrendered, when an application is first made for the enjoyment of American privileges, the words and policy of the law are satisfied ; nor will the court go beyond the words of a law, to create a forfeiture. (1 Bos. & Pul. 483 ; 19 Vin. Abr. 512, pl. 8, 9 ; 3 T. R. 401 ; 2 East 399.) The 17th section of the act, however, seems to fix the sense of the legislature ; for it obviously contemplates the disclosure of a transfer, while

Willing v. United States.

the vessel was at sea ; and if the oath which it prescribes, is truly taken, there is no forfeiture of her American character.

The doctrine conten led for, on behalf of the United States, would introduce the greatest mischiefs. Could congress mean (in an act, too, for the benefit of American tonnage and navigation), so to tie up the property in ships, that, while they are at sea, they could not be sold, without incurring a forfeiture of their privileges ?  And is it consistent with justice and reason, that the innocent shippers of a cargo on board an American vessel, should be taxed with the payment of foreign duties, in consequence of successive transfers, to which they were neither parties nor privies ?  To these inconveniences, the claim of foreign duties, in this case, adds the reproach, *384] that congress has required *an impossibility ; to wit, the immediate surrender of the register at the custom-house, while, in fact, it was on board of the vessel, at sea.

As to a contemporary construction, it is not clearly and uniformly shown, in favor of the adverse doctrine ; nor, if it were, could it prevail against the plain words and obvious meaning of the law.  And as to a supposed legislative construction of the act of the 2d of March 1803 (6 vol. 223, § 3, 4), the act is merely affirmative ; and even if it were declaratory of the legislative opinion, upon the previous state of the law, it could not be binding upon the judges, who must exercise their own judgments upon the law itself, independent of legislative exposition.

WASHINGTON, Justice.—Although the pleadings, in this case, are lengthy, it has been agreed by both parties, that the only question to be considered and decided, upon the whole record, is, whether the cargo imported in the ship Missouri, is subject to the payment of foreign or of domestic, duties ?

By the first section of the " act concerning the registering and recording of ships or vessels," passed on the 31st of December 1792, it was provided, that all vessels, registered pursuant to that law, should be denominated and deemed vessels of the United States : and all vessels of the United States, are entitled, by law, to certain benefits and privileges denied to foreign vessels ; so long as they shall continue to be wholly owned, and to be commanded, by a citizen or citizens of the United States.

The ship Missouri was a duly registered vessel of the United States, and has always continued to be owned and commanded by citizens.  She was, therefore, entitled to the benefits and privileges of her American character, when she arrived at the port of Philadelphia, in November 1802 ; unless the partial sale made to American citizens, while she was at sea, deprived her of that character.  Whether the transaction referred to, produced such an effect, may, I think, be decided upon a joint consideration of the fourteenth and first sections of the registering act alone ; though other sections will afford fair ground for reasoning and illustration.

The 14th section is composed of several sentences, which must be distinctly, as well as collectively, considered, to ascertain the general meaning and result.  The first sentence declares, that when a registered vessel is sold to a citizen, she shall be registered anew, by her former name, or she shall cease to be deemed a vessel of the United States, and that her former register shall be delivered up, at the time of applying for a new one.  The second sentence leclares, that in every such case of sale or transfer, there

### Willing v. United States.

shall be a bill of sale, reciting, at length, the certificate of registry, other-
wise the vessel shall be incapable of being registered anew. And the
third sentence declares, generally, *that in every case, in which a ves-        [*385
sel is required to be registered anew, she shall not be entitled to the
privileges of a vessel of the United States, if she is not so registered.

It is difficult to conjecture, why, in the first sentence, the want of a new
register should be declared, within a parenthesis, to deprive a vessel of her
American character ; and that, in the third sentence, the same effect should
be again declared, for the same cause. The latter declaration, however, is
obviously, tautology : for if the former declaration can be said to have
destroyed the privilege, *eo instanti*, when the sale was effected ; it was
useless and superflous to repeat, that the vessel should not, at any sub-
sequent period, be entitled to enjoy it. The clear meaning, however, of
both sentences, appears to be, that the vessel should lose her American
privileges, not simply upon the sale, but upon the neglect to obtain a new
registry, after the sale. It is here, then, material to inquire, in what
manner, and on what terms, a new registry can be obtained ? A bill of sale,
reciting the old certificate of registry, must be produced to the collector.
The old certificate of registry must also be surrendered. Now, though a
bill of sale might be formally executed, in the absence of the ship ; yet, the
ship is bound, by law, to carry the certificate of her registry with her ; and
consequently, it is impossible for her owner to surrender that instrument
to the collector, while she is herself at sea. If, however, the surrender of
the certificate must be made, or the privilege must be lost, it is manifest,
that the law either requires the performance of an impossibility (which is
not hastily to be imputed to the expression, and never to the intention of a
law), or it prohibits, in effect, the sale of a ship, at sea, by one of our
citizens to another.

There is no part of our navigation system, that expressly avows this to
be the intention of the legislature ; and from what principle of public policy
can it be inferred or presumed ? The cargo is not liable to the claim of
foreign duties, until an actual sale of the ship ; and why should the owner
of the cargo lose his privilege, on account of the sale, which is an act of the
owner of the ship alone ? Or be punished as for a fault, on account of
the neglect of the owner of the ship to take out a new register ; an omission
which the owner of the cargo can neither prevent nor supply ? Even, how-
ever, with respect to the ship, why, I repeat, should the privilege be lost,
and her owner punished, as for a fault, in omitting to deliver an instrument
to the collector, on shore, which the law directs to be kept on board her, at
sea ? A consequence more injurious would not proceed from a sale to an
alien ; and yet, in the case of a sale to an alien, the act of congress declares
the forfeiture of the American privilege in express words ; as being incurred,
*eo instanti*, on the sale ; but no such declaration is made, in the case of a
sale to a citizen.

*It appears to me, that the fourth sentence of the 14th section of           [*386
the act is also important ; for it declares, that " if the former certifi-
cate of registry shall not be delivered up as aforesaid, the owner or owners
of the ship or vessel, shall forfeit and pay the sum of $500 :" And thus,
if the construction contended for by the attorney of the United States is
correct, the law not only prohibits the sale of a vessel at sea, by one citizen
to another, on pain of forfeiting, at the moment of sale, the privileges of

the vessel; but subjects the owner to a penalty, although it is physically impossible, that he should do the thing, for the omission of which he is to be punished.

But an American vessel does not cease to be entitled to her privilege, any more by the act of sale, than by the act of altering her form or burden; both cases being embraced by the provisions of the 14th section. Let us suppose, therefore, that the construction of the vessel should be altered, either in the port to which she belongs, or in any other port: would she lose her privilege, before the owners could have an opportunity to apply for a new registry? And if not, why should the privileges be lost, before an opportunity occurs to make the application for a new registry, in the case of a sale? I can perceive no reason for a distinction.

As to the provisions of the 17th section, they are designed to compel a discovery of any transfers of a vessel, which may have been made, during her absence from the port; in order that it might appear, whether she continued to be a privileged vessel of the United States. If it appeared, that she had been transferred to a foreigner, her privileges were forfeited, from the moment of transfer; and if it appeared, that she had been sold to a citizen, the officers of the customs were enabled, by a knowledge of the fact, to exact the foreign duties, in future, should no application be made for a new registry.

I am, upon the whole, of opinion, that the appellants are not liable for higher duties, than are payable by vessels of the United States; and consequently, the judgment of the district court must be reversed.

Judgment reversed.(a)

---

*387]　　　　*OCTOBER TERM, 1804.

Present—Washington, Justice, and Peters, District Judge.

---

(a) This judgment was affirmed by the supreme court, in 4 Cr. 48.
(b) s. c. 1 W. C. C. 186.